ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
KEVIN GRANT,                       :
             Petitioner,      :
                                    : REPORT & RECOMMENDATION
   -against-                      :
                                    : 05 Civ. 2380 (SCR) (MDF)
ROBERT WOODS, Superintendent,      :
Upstate Correctional Facility,     :
                                    :
             Respondent.       :
----------------------------------x

TO: THE HONORABLE STEPHEN C. ROBINSON, U.S.D.J.

     Petitioner has filed an application for a writ of habeas corpus pursuant to 28 U.S.C. §2254 to challenge his convictions for Rape in the First Degree (N.Y. Penal Law §130.35[1]), Sexual Abuse in the First Degree (two counts) (N.Y. Penal Law §130.65[1]), Unlawful Imprisonment in the First Degree (N.Y. Penal Law §135.10), Criminal Possession of a Weapon in the Fourth Degree (N.Y. Penal Law §265.01[2]), Sexual Misconduct (N.Y. Penal Law §130.20[1]), and Endangering the Welfare of a Child (N.Y. Penal Law §260.10[1]). Pursuant to Petitioner's convictions in County Court, Orange County, the Honorable Jeffrey G. Berry, sentenced Petitioner to concurrent terms of imprisonment, the longest of which is a determinate sentence of twelve (12) years.

Statement of Facts



1

The evidence most favorable to the verdict discloses that on October 25, 2001, Petitioner invited Kathryn Harrigan into his bedroom where he bound, gagged, and raped her.

Ms. Harrigan, the only direct witness against Petitioner, testified, that she had a sexual relationship with Petitioner prior to October 25, 2001. Tr. at 45-50.[1] The couple had produced a child, Isaiah. Tr. at 45. They broke up in October or November 2000 but maintained an "on and off" relationship. Tr. at 45-50.

On the morning of October 25, 2001, sometime after 8:00 a.m., Petitioner arrived at the victim's home. Tr. at 50-51. Harrigan subsequently agreed to accompany Petitioner to the mall in his car to purchase sneakers, ostensibly, she thought for her birthday. Tr. at 52-53. She brought Isaiah. Tr. at 52. When they left the victim's home, they first went to a Burger King restaurant and thereafter to Petitioner's home in the Town of Newburgh, New York. Tr. at 53-54. She entered the house, where she had been before, to allow Petitioner to spend time with his son. Tr. at 56-59. Once inside, at Petitioner's request, the victim accompanied Petitioner to his bedroom. Petitioner sought reconciliation, but his approach led to an argument. Tr. at 59-60. They left their son, Isaiah, downstairs. Tr. at 60. After

---

[1] "Tr." references are to the three (3) volume, continuously paginated transcript of the trial.

2

she indicated that she wanted to go home and then began to leave, Petitioner grabbed her wrists to prevent her from leaving. Tr. at 60-61. Petitioner next pushed her onto his bed face down and tied her hands behind her back. Tr. at 60, 63. Petitioner then left the room for a few minutes and she started to go towards the door. Tr. at 64-65. She was not able to leave before he returned. Tr. at 65. Once back in the room with her, Petitioner walked the victim back to his bed, took off the scarf the victim was wearing and tied the scarf around her mouth. Tr. at 65-66. He then secured the scarf with masking tape, taped her eyes shut, and turned on a loud CD. Tr. at 65-67. He then left the room again. Tr. at 68. She tried to untie herself and remove the tape. Tr. at 68. As she had not been able to untie herself or leave before Petitioner returned, he pulled down her pants and felt and licked her breasts. Tr. at 68-70. He ignored her request to stop. Tr. at 71. He then lifted her up and put her on the floor, took off his belt and pants, and once again ignoring her plea to stop, and thwarting her kicking, he had intercourse with the victim. Tr. at 71-74.

When Petitioner finished, he turned the victim over on her back, straddled her, and placed a plastic bag over her face which prevented her from breathing. Tr. at 75-76. He told her that he loved her and that he did not want to hurt her but that he would shoot her if she did not "stop." Tr. at 76. She eventually

freed her hands and tried to poke holes in the bag and tried to push Petitioner off of her. Tr. at 77-78.

Petitioner eventually relented, which allowed the victim to remove the tape from her eyes and mouth, whereupon she observed Petitioner as he redressed himself. Tr. at 78-79. She also put her clothes back on and noticed that her son was next to her in his car seat. Tr. at 79. Petitioner agreed to drive her home after his insistence that they each smoke a cigarette in the rear of his house. Tr. at 80-81.

As her parents had obtained an order of protection in her favor against Petitioner, the victim did not want her mother to see her in Petitioner's company; accordingly, upon arriving home, she told Petitioner not to drop her of in front of her home but nearby. Tr. at 82. She exited Petitioner's car and was removing Isaiah from the car when Petitioner began to drive away. Tr. at 83. In response, the victim pushed Isaiah back into the car and re-entered the car herself. Tr. at 83. Upon asking Petitioner what he was doing, Petitioner, who was still driving the car, said that he knew she was going to tell on him, that he could not get in trouble, that he was sorry and that he did not mean to hurt her. Tr. at 83. After she screamed at Petitioner, he then turned his car around and brought her and Isaiah home around 12:30 P.M. Tr. at 83.

Once inside her home, she contacted the Village of Goshen

Police Department, and after mentioning where she had been raped, she was told to contact the Town of Newburgh Police Department. Tr. at 84-85. While in the middle of complaining to the Town of Newburgh Police Department and that Petitioner had raped and had tried to kill her, she hung up the phone when she saw her mother arrive home. Tr. at 85. She was crying hysterically when she met her mother at the door and told her mother that Petitioner had raped her. Tr. at 86. Her mother then contacted the Village of Goshen Police Department. Tr. at 86. Officer Anthony Pitt responded to the call, met them at the Harrigan home and escorted them to Horton Hospital for an examination by a Sexual Assault Nurse Examiner ("SANE"). Tr. at 86-87, 145-147.

At the hospital, the victim described the condition of Petitioner's room to the police and specified the items Petitioner had used to commit the rape. Tr. at 89. She also met with SANE Erin Ptak, tr. at 85, who observed that she was quiet and avoided eye contact and that she had red marks on her face, cuts on her lips and nose, and redness on her cheeks and neck. Tr. at 336-337. Ptak examined her body for forensic evidence including DNA, hair, or other "debris" that might be present. Tr. at 338-344. The examination resulted in the discovery of the presence of bodily secretions on her person and clothing and physical trauma. Tr. at 90-91, 338-356. All evidence recovered from the examination was turned over to the

5

Town of Newburgh Police Department.  Tr. at 269, 356.

Petitioner was apprehended and read his <u>Miranda</u> warnings shortly after 7:00 P.M., approximately fifteen minutes after members of the Town of Newburgh Police Department executed a search warrant at Petitioner's address.  Tr. at 157-158, 161-165, 191-197, 209-210, 212-213, 216-218.  Pursuant to the warrant, the police recovered evidence and photographed the scene.  Tr. at 158, 216-238.  After being read his rights, Petitioner admitted sexual intercourse with Harrigan.  Tr. at 172-173, 175. He confirmed that he had tied her up and had put tape over her eyes and mouth but maintained that the encounter had been consensual. Tr. at 172-174, 202-203.

At trial, after the prosecution rested and Petitioner was expected to offer his case, he failed to appear in court, despite having left a note to his parents that he would be in court at 10:00 a.m.  Tr. at 394, 396.  Having issued warnings pursuant to <u>People v. Parker</u>, 57 N.Y.2d 136, 141, 454 N.Y.S.2d 967, 970 (1982), tr. at 140, the state trial court sent investigators to search for Petitioner, tr. at 396, and then waited five hours to see if Petitioner would present himself, tr. at 413.  During the five hour hiatus, counsel discussed the jury charge, tr. at 403-415, and apparently Petitioner left a voice mail message with the victim that he was in the area of Middletown, New York, tr. at 396-397.  When Petitioner did not return, the state trial court

found that he had "willfully" absented himself from trial, tr. at 413, at which point defense counsel rested, tr. at 416, because Petitioner was the defense's only witness, tr. at 397. Petitioner was subsequently convicted *in absentia* and sentenced as mentioned above. Tr. 512-513. On direct appeal he raised two points: (1) instances of ineffective assistance of counsel and (2) the sentence was excessive. The Supreme Court, Appellate Division, Second Department, affirmed the convictions and found that the record did not support Petitioner's claim of ineffective assistance of counsel and that the sentence was not excessive. People v. Grant, 1 A.D.3d 377, 766 N.Y.S.2d 869 (2d Dep't 2003), lv. denied, 1 N.Y.3d 628, 777 N.Y.S.2d 27 (2004). The instant petition raises the alleged instances of ineffective assistance of counsel, although elaboration has been added to the argument in support thereof.

## Discussion

> Strickland [v. Washington] established a two prong test to determine whether counsel has been ineffective. A defendant, must prove that: (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 688, 694, 104 S.Ct. 2052; (citations omitted).

Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006), cert. denied, 127 S.Ct. 1383 (2007).

7

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See *Michel v. Louisiana*, 350 U.S., at 101, 76 S.Ct., at 164.

Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065 (1984).

Specifically, Petitioner faults his trial counsel for: (1) failing to secure petitioner's attendance at trial as a witness for the defense and failing to object when the state trial court went forward in his absence; (2) failing to present a coherent theory of the consent defense; (3) failing to offer evidence on behalf of the defense apart from Petitioner's testimony; (4) eliciting and failing to object to improper testimony; (5) delivering a deficient summation; and (6) failing to defend Petitioner.[2] With the exception of the first ground, all of Petitioner's complaints concerning trial counsel's allegedly deficient performance are not supported by the record or may be attributed to strategic and tactical choices.

---

[2] The pleading consists of one ground under which are handwritten conclusions, the last of which is "or defend the petitioner." As Petitioner's final submission does not specifically address this item, the Court has understood "or defend the petitioner" as an allegation of his attorney's overall assessment of counsel's performance.

8

Ground One (Petitioner's absence)

As would be expected and quite reasonable, the consent defense in this case rested heavily on Petitioner's testimony. Counsel proceeded through the trial with the expectation that Petitioner would testify and, given the nature of their relationship, undoubtedly would put the prosecutrix's testimony in a very different light. The jury didn't hear that testimony because Petitioner absented himself from trial. The record discloses that Petitioner was not in custody, that his attorney had every reason to expect that Petitioner would be present, that Petitioner had indicated to his parents that he would be present and that Petitioner has offered no reasonable excuse for his failure to attend. A defendant who voluntarily absents himself from his trial and from contact with his trial counsel cannot later obtain relief from a conviction on the allegation that his attorney failed to secure his attendance. No lawyer can be expected to be aware of his client's every move and undisclosed intention, particularly an intention to violate his bail conditions and absent himself from his trial.

On March 11, 2002, the day prior to Petitioner's disappearance, the prosecution rested its case-in-chief. Tr. at 388. Petitioner was made aware that he would testify the next day, March 12, 2002, as evidenced by the discussion with his

9

trial counsel and the state trial court. Tr. at 388, 390, 394-395, 413. Despite having left a note telling his parents he would be in Court at 10:00 a.m., tr. at 396, Petitioner failed to appear in court on March 12, 2002 and March 13, 2002, the remainder of his trial. Tr. at 394, 445. Petitioner eventually surrendered prior to sentencing, and not at that hearing nor in this proceeding has he offered any explanation for his absence. The circumstantial evidence suggests that the absence was without good cause. Petitioner made it known the day he absconded that he was in the vicinity of the court when he called the victim and left a message telling her that he was in the Middletown, NY area. Tr. at 396-397. Further, the New York State Police spotted Petitioner's automobile on March 12, 2002 in a local mall parking lot. Tr. at 397. In light of the record the state trial court determined that Petitioner "willfully absented himself from [his] trial." Tr. at 413.

Petitioner additionally contends that his trial counsel failed to seek an adjournment and failed to object to the continuation of the trial. This argument is also unsubstantiated as the record indicates that Petitioner's trial counsel consented to a short adjournment at the state trial court's suggestion. Tr. at 396. This was a reasonable response to Petitioner's absence. When the adjournment had passed, and counsel still had not heard from his client, his choices were narrowed when the

10

state trial indicated its intent to go forward. He could not in good faith represent when or if his client was going to return, he had not planned to put on any additional evidence and a bare objection to proceeding would have been overruled. In effect, it was. As the United States Supreme Court observed in Taylor v. United States 414 U.S. 17, 19, 94 S.Ct. 194, 195 (1973) (per curiam), quoting Diaz v. United States, 223 U.S. 442, 455, 32 S.Ct. 250, 254 (1912):

> "[W]here the offense is not capital and the accused is not in custody, the prevailing rule has been, that if, after the trial has begun in his presence, he voluntarily absents himself, this does not nullify what has been done or prevent the completion of the trial, but, on the contrary, operates as a waiver of his right to be present and leaves the court free to proceed with the trial in like manner and with like effect as if he were present." (Citations omitted.)

Accord Crosby v. United States, 506 U.S. 255, 260, 113 S.Ct. 748, 752 (1993). Petitioner's complaint has no merit. See United States v. Sanchez, 790 F.2d 245, 253 (2d Cir.), cert. denied, 479 U.S. 989 (1986).

Ground Two (incoherent defense)

The alleged lapses which Petitioner cites to support his claim that the consent defense was not presented as a coherent theory stem largely from hindsight and tactics. He claims that counsel did not elicit evidence concerning consent from any witness without identifying which witness would have offered what testimony. He asserts that counsel did not explore with the

11

victim the reasons why she went to Petitioner's bedroom as if apparently he believes she would not have denied an insinuation in leading questions that the purpose was to have consensual sex as they apparently had done before. He additionally fails to explain what point would have been served by reiterating on cross-examination that the parties previously had engaged in consensual sexual intercourse. The victim had admitted the relationship on direct examination. The details would not have mattered but if they did, they could have been supplied by Petitioner who chose not to testify. Similarly, Petitioner could have confirmed that he had no evidence of scratches on him, although it was more likely, given the rough sex referenced in his statement to the police, that he would have to confirm the victim's testimony. Contrary to Petitioner's assertion, the cross-examination of the victim concerning the tape that was used did not tend to undermine a consent defense. Counsel asked the victim to identify tape, and when she characterized the tape as "masking" tape, he asked if she had ever heard of "duct" tape, and after she answered affirmatively, he asked if she had ever told anyone that she had been tied up with duct tape. She answered that she might have. Tr. at 127-128. An individual engaged in kinky consensual sex is not likely to be focused on the details of the tape used. The jury might well have inferred that the sex had been consensual because, among other

12

circumstances, she could not remember specifically the kind of tape, masking or duct, that had been used.[3] Without specifying the areas of inquiry, Petitioner also faults counsel for not cross-examining the State's witnesses, the police officers, the SANE nurse and the victim's mother, to elicit evidence consistent with consent. He fails to explain what that evidence would have been, and the circumstances, that Petitioner and the victim were the only direct witnesses, suggest that there was none.

Ground Three (no defense evidence)

Petitioner's argument that his trial counsel should have offered evidence despite Petitioner's absence is a matter of hindsight and strategy. On the day prior to Petitioner's absence, Petitioner's trial counsel had notified the state trial court that he would be presenting only one witness, Petitioner. Tr. at 390. Without Petitioner there was no consent defense, and Petitioner has failed to identify any witness who would have been able to establish that defense in his absence.

Without presenting any evidence of their testimony, Petitioner also asserts that witnesses should have been called to rebut the findings of the DNA analysis and the SANE nurse. The

---

[3] During the exchange, it became apparent that the victim did not differentiate between duct tape and masking tape. Counsel could not have known that would be the case before he sought to demonstrate that she had said masking tape at one point and duct tape at some other point.

13

identity of the assailant was never in issue. Petitioner adds that his parents should have been called to testify about his relationship with the victim. However, they have not offered affidavits concerning their knowledge of this relationship and its intimate nature.

Petitioner also believes that through the testimony of his mother counsel should have established that the victim sent letters to his parents after the rape and before trial. He offers no citation to the record to establish the assertion that counsel knew about these letters. Doc. #7 at 22.[4] Without the letters, which have not been offered in this proceeding, this Court cannot determine what effect their contents would have had in terms of diminishing the victim's credibility. Moreover, to establish consent, no letter could substitute for Petitioner's credible testimony in terms of refuting his accuser.

Ground Four (improper testimony)

The hostility of the victim's parents toward Petitioner was obvious. Tr. at 261. This circumstance provided an opportunity for counsel to paint her parents as people who would do anything to keep him away from their teenager and therefore explains why he would ask the victim if her parents had ever pursued their own

---

[4]To be sure, trial counsel attempted to impeach the victim with letters she had written to Petitioner while she was in the Rockland Psychiatric Center. Tr. at 116-123.

14

charge against Petitioner, apparently a claim of harassment which stemmed from having received a series of hang-up telephone calls. The jury heard that the harassment involved hang-up calls from the victim's mother, first on direct, tr. at 255, and then on cross, tr. at 262. At the time counsel declined the state trial court's offer to strike the testimony about the harassment charge, he undoubtedly expected Petitioner would testify. But, Petitioner did not testify, and as a result, the story for the jury was not complete, i.e., the jury never heard whether and/or why he had made the telephone calls, and if he had made them, he no doubt did so to establish contact with the mother of his son without first having to consult her parents.

Ground Five (deficient summation)

For counsel to be considered ineffective, his summation, viewed as a whole, must be considered deficient and prejudicial. See United States v. Hon, 17 F.3d 21, 26-27 (2d Cir. 1994); United States v. Salameh, 54 F. Supp.2d 236, 255 (S.D.N.Y. 1999). Petitioner's complaints about the summation are nitpicking and fail to acknowledge that his attorney could not ask the jury to accept his testimony, which undoubtedly he had intended to do.

Although Petitioner cannot discern a reasonable strategy for referring to counts of the indictment that concerned calling her and so forth, the reference was brief and, if mistaken, was of no

15

consequence. From a tactical standpoint the subtle suasion of reminding the trier of fact, even indirectly, that the court has dismissed counts of an indictment cannot be underestimated. The reference was made as apart of an assertion that no evidence supported these counts, which, having been dismissed, were not going to be presented to the jury, i.e., as the judge had dismissed counts which lacked evidence, so should the jurors in their deliberations. The references to evidence having been conveniently found were hardly prejudicial; they tended to emphasize that the scene had been staged to comport with the victim's allegations. Consistent with the theme that there had been rough consensual sex, counsel pointed out that the gag Petitioner had used had been a scarf and not a rag, and similar to the circumstances relevant to the other claims, he had no testimony from his client for contrast.[5] Finally, the emphasis on the event as a childish dispute, which would probably have occurred even if Petitioner had testified, was hardly poor tactics. The relationship had been filled with animosity, the alleged victim was young and the parents arguably had not coped reasonably with the circumstance of their daughter having been an unwed teenage mother nor with the circumstance of having to deal

---

[5] If as Petitioner states, the references to the conveniently found evidence and the scarf vs. the rag were not relevant to the consent defense, they did not harm it either, and if irrelevant, could not have harmed the defense.

16

with Petitioner as the father of their grandson. In sum, Petitioner's assignments of error do not detract from a summation which should have been premised on his testimony and instead had to rely on drawing inferences from circumstances in a case where that testimony was crucial.

Based on the foregoing, I respectfully recommend that your honor dismiss this petition for writ of habeas corpus.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Rule 72(b), Fed. R. Civ. P., the parties shall have ten (10) days, plus an additional three (3) days pursuant to Rule 6(e), Fed. R. Civ. P., or a total of thirteen (13) working days, (see Rule 6(a), Fed. R. Civ. P.), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Stephen C. Robinson, at the United States Courthouse, 300 Quarropas Street, Room 533, White Plains, New York 10601.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order or judgment that will be entered by Judge Robinson. See Thomas v. Arn, 474 U.S. 140 (1985); Frank v. Johnson, 968 F.2d 298 (2d Cir.), cert. denied 113 S.Ct. 825 (1992); Small v. Secretary of

H.H.S., 892 F.2d 15, 16 (2d Cir. 1989) (per curiam); Wesolek v. Canadair, Ltd., 838 F.2d 55, 58 (2d Cir. 1988). Requests for extensions of time to file objections must be made to Judge Robinson and should not be made to the undersigned.

Dated: June 22, 2007
White Plains, New York

                                 Respectfully submitted,

                                 _____
                                 Hon. Mark D. Fox
                                 UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing Report and Recommendation have been sent to the following:

Hon. Stephen C. Robinson

Samuel M. Braverman, Esq.
901 Sheridan Avenue
Bronx, New York 10451

Andrew R. Kass, Esq.
Assistant District Attorney
County Government Center
Goshen, New York 10924